**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERICAN DIABETES ASSOCIATION,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **No. 13-3720** |
| | : | |
| **THE FRISKNEY FAMILY TRUST,** | : | |
| **LLC, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                                                       **April 6, 2016**

<u>**MEMORANDUM OPINION**</u>

This case involves the second trademark infringement lawsuit between the parties. In the current suit, Plaintiff, American Diabetes Association ("ADA"), has filed various Lanham Act claims against Defendants, Robert L. Friskney ("Friskney"), the Friskney Family Trust ("FFT"), and Medvantage Plus, LLC ("Medvantage"). Plaintiff also brings a breach of contract claim against Friskney and FFT stemming from a settlement agreement entered into by the parties in their first lawsuit, <u>Am. Diabetes Ass'n v. ADS Med. Servs., Inc., et al.</u>, Dkt. No. 12-cv-3354.

In that case, Plaintiff sued Friskney and FFT's predecessors-in-interest, ADS Medical Services, Inc. and American Diabetes Services, Inc. (collectively, "ADS") for alleged violations of the Lanham Act ("ADS litigation"). Plaintiff had accused ADS of infringing upon the "**American Diabetes Association**" trademark registered with the United States Patent and Trademark Office by using the "confusingly similar" marks "American Diabetes," "American Diabetes Services," and similar website domain names, such as "americandiabetes.com." That

case was resolved by the parties through a comprehensive written settlement agreement, which included both Friskney and FFT.[1]

In the current dispute, Plaintiff alleges that Friskney and FFT violated the settlement agreement, giving rise to a breach of contract claim (Count I) against both Defendants (Medvantage, a defendant here, was not a party to the previous litigation or Settlement Agreement, and therefore, Plaintiff has not included a breach of contract claim against Medvantage). Plaintiff has also renewed its Lanham Act claims against all three Defendants, alleging: trademark infringement under § 32(1), 15 U.S.C. 1114(1) (Count II), false designation of origin under § 43(a), 15 U.S.C. 1125(a) (Count III), and cyberpiracy[2] under § 43(d), 15 U.S.C. 1125(d) (Count IV). Plaintiff has included a claim for unfair competition under Pennsylvania common law against the same three Defendants (Count V). (Compl. ¶¶ 44–77.)[3] Defendants have filed counterclaims for breach of contract (Count I) and reverse domain name hijacking (Count II). (Friskney 3d Am. Answer ¶¶ 83–93; FFT and Medvantage 3d Am. Answer ¶¶ 83–93.)

Before me are (1) Plaintiff's motion for summary judgment on Defendants' counterclaims; (2) Friskney and FFT's motion for summary judgment on liability as to all of Plaintiff's claims; and (3) Medvantage's motion for summary judgment on Plaintiff's Lanham Act and unfair competition claims. For the reasons that follow, I will grant Plaintiff's motion;

---

[1] Friskney and FFT were settling parties because they had purchased the rights to the allegedly infringing marks during the course of the ADS litigation.

[2] The "Anticybersquatting Consumer Protection Act" ("ACPA"), under which a claim for cyberpiracy arises, was added to the Lanham Act in 1999. See Shields v. Zuccarini, 254 F.3d 476, 479 (3d Cir. 2001).

[3] Medvantage is a defendant in this lawsuit because Plaintiff alleges that Friskney registered the domain name "americandiabetessupplies.com," which displayed an "American Diabetes" logo, and further displayed text indicating that "American Diabetes" was a "division" of Medvantage. (Compl. ¶ 5.) Because Friskney is Medvantage's registered agent and a managing member, Plaintiff argues that Medvantage is liable for contributory or vicarious infringement. At oral argument, defense counsel was asked to clarify Medvantage's relationship to Friskney and FFT. Counsel acknowledged that Mr. Friskney is the owner of Medvantage. (Tr. of Oral Argument, 33:18–23 (February 29, 2016).)

grant in part and deny in part Friskney and FFT's motion; and, grant in part and deny in part Medvantage's motion.

## I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[4]

The parties resolved their first lawsuit on March 12, 2013 by entering into a Settlement Agreement (the "Agreement"). Friskney and FFT's obligations were outlined in Paragraph 5 of the Agreement, the relevant portions of which state:

> Friskney and FFT each agree that they will immediately cease and refrain from forever using AMERICAN DIABETES … or any confusingly similar designation, alone or [in] combination with other words, phrases, symbols, or designs, as a … domain name component[.] (Agreement, p. 5 ¶ 5.)

> By April 15, 2013, FFT and/or Friskney shall undertake all appropriate measures to cancel, delete, terminate and otherwise remove all reference to their use of AMERICAN DIABETES … on all social media channels, including without limitation Twitter™ ("@AmDiabetes"), [and] Facebook™ (http://www.facebook.com/AmericanDiabetes)[.] (<u>Id.</u> at p. 6 ¶ 5(c).)

> No later than January 15, 2014, Friskney shall transfer all title and interest in and to the registration for the AMERICANDIABETES.COM domain name to [Plaintiff], and fully cooperate with [Plaintiff] to facilitate the filing and processing of any and all forms and other formalities necessary to complete the transfer[.] (<u>Id.</u> at p. 6 ¶ 5(e).)

Friskney relies heavily on Paragraph 7 of the Agreement, which states:

> Subject to Paragraph 5 and for a period of two (2) years, commencing on the Effective Date [March 12, 2013] and ending on January 15, 2015, the FFT will be entitled to the benefits as an authorized sponsor of [Plaintiff's] 'Stop Diabetes® Movement' program, subject to the terms and conditions set forth in the Sponsorship Agreement, which is annexed as Exhibit C and is made part hereof. (<u>Id.</u> at p. 7 ¶ 7.)

---

[4] The following facts are undisputed, unless otherwise noted.

Additionally—and critical to my analysis regarding the parties' respective breach of contract claims—the Agreement contained the following integration clause:

> This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this Agreement will be binding unless executed in writing by all the parties. (Id. at pp. 10–11 ¶ 20.)

With these provisions in mind, I turn to the undisputed facts of record. The following events occurred chronologically, following execution of the Agreement on March 12, 2013.

On March 14, 2013, just two days after signing the Agreement, Friskney threatened via email to sell the "americandiabetes.com" domain name to a third party for $38,000. Friskney made this statement after Dexter Cummings, Managing Director of Legal Affairs for Plaintiff, asked to execute a brief amendment to the Agreement because of a date inconsistency. (Pl.'s Ex. B, Doc. No. 53.) This fact will become important in evaluating Friskney's "good faith and fair dealing," discussed *infra*.

Thereafter, between March 19, 2013 and April 3, 2013, Odette Brown, Associate Director of Client Services for Plaintiff, contacted Friskney via telephone and email multiple times in an attempt to coordinate the Sponsorship outlined in Paragraph 7. (Pl.'s Ex. A-1, Doc. No. 70; Brown Decl. ¶¶ 17–27.) On at least one occasion, Friskney asked to reschedule the pair's conference call, and on other occasions, Friskney did not answer or otherwise return Brown's phone calls. (Brown Decl. ¶¶ 17–27; Defs.' Ex. D, Doc. No. 62.)[5]

---

[5] When asked about this sequence of events, Friskney's counsel stated, ". . . the fact [that Friskney] didn't return phone calls to [Brown] doesn't make a difference." (Tr. of Oral Argument, 31:1–6.) Additionally, this sequence of events—with the specific dates on which Brown either called and/or emailed Friskney— is outlined in Plaintiff's response in opposition to Friskney and FFT's motion for summary judgment on liability. (Pl.'s Resp., pp. 7-9, Doc. No. 70.) Nowhere in their reply brief do Defendants deny that Brown made multiple attempts to contact Friskney, or that his first response to Brown after their March 26, 2013

The purpose of these attempted contacts was for Brown to gather preliminary information from Friskney (as a new sponsor) so that her team could list FFT on Plaintiff's website. Brown explained that it was necessary to discuss several items with new sponsors to coordinate their being placed on Plaintiff's website, including: confirmation of the brand to be promoted, including a brief summary and overview of the company; the logo of the sponsor to be featured on Plaintiff's "diabetes.org/stopdiabetes.com" website; the sponsor's URL to which the Plaintiff's website would link; and, confirmation of certain dates and milestones for the sponsorship. (Brown Decl. ¶¶ 10–12.) Brown explained that once she obtains this information from a sponsor, it typically takes approximately two (2) weeks to actually place the sponsor on Plaintiff's website. (Id. at ¶ 14.)

On April 23, 2013, having not heard back from Friskney, Brown again contacted him via email inquiring as to whether he would be available to speak on April 26, 2013. (Pl.'s Ex. A-1, Doc. No. 70.) Friskney responded to Brown's email the following day on April 24, 2013 asking whether new sponsors receive a "welcome package," and reiterating that he wanted to receive the same treatment as any other sponsor notwithstanding the fact that this was a "forced" relationship. (Defs.' Ex. I, p. 13, Doc. No. 62.) That same day, Brown stated that she would prepare the sponsorship timeline and send it to Friskney, and a follow-up conversation would occur once he had an opportunity to review the document. (Id.)

On May 5, 2013, less than two months after executing the Agreement wherein he was obligated to immediately cease using "American Diabetes," or "any confusingly similar designation," Friskney registered the website domain name "americandiabetesupplies.com" with GoDaddy, an internet domain name registrar. (Friskney Dep. 55:20–22; 56:1–3.) Friskney does

---

conference call (which Friskney cut short) came on April 24, 2013—almost a month later. (Friskney & FFT Reply, pp. 8-9, Doc. No. 75.) I will therefore consider this sequence of events undisputed.

not dispute that he registered "americandiabetesupplies.com" in connection with his online diabetic supplies business.[6] Rather, he explains that he did so only after seeking permission from Dexter Cummings. At his deposition, Friskney testified that Cummings verbally consented to his registering of "americandiabetesupplies.com" during a telephone conversation prior to the execution of the Settlement Agreement (March 12, 2013).[7] (Friskney Dep. 55:20–22; 56:1–13.) Friskney claims that he needed to set up this temporary commerce site which would later be turned over with "americandiabetes.com" pursuant to Paragraph 5(e) of the Agreement. (Defs.' Resp. 13, Doc. No. 60.)

On May 29, 2013, May 30, 2013, June 3, 2013, June 4, 2013, and June 5, 2013—approximately six weeks after the Agreement's April 15th deadline by which Friskney and FFT were required to remove all references to "American Diabetes" from their social media accounts—Friskney and FFT's Facebook account contained several *new* postings with references to "American Diabetes." (Pl.'s Ex. F, pp. 13–14, Doc. No. 53.) Friskney acknowledged during his deposition that employees within his organization made these posts. (Friskney Dep. 91:20–22; 92:1–5.)[8] Additionally, the original posts that were required to be removed by the April 15th deadline also remained beyond that date. (Pl.'s Ex. F, pp. 14–24, Doc. No. 53.)

---

[6] During oral argument, Friskney's counsel twice confirmed that it is undisputed that Friskney registered "americandiabetesupplies.com" on May 5, 2013 with GoDaddy. (Tr. of Oral Argument, 19:5–9; 26:4.)

[7] In his response in opposition to Plaintiff's motion for summary judgment, Friskney states that the conversation between he and Dexter Cummings occurred *on* March 12, 2013—the date of execution. As will be discussed *infra*, whether this conversation occurred prior to or contemporaneous with execution of the Agreement is immaterial.

[8] During oral argument, Friskney's counsel was asked, "[D]o you concede that it is undisputed that there were Facebook [posts] that made reference to American Diabetes?" Counsel answered, "Yes." I then asked defense counsel, "Do you concede, also … that [these Facebook posts were] done by Mr. Friskney's employees at his direction?" Counsel again responded, "Yes." (Tr. of Oral Argument, 33:4–9, 13–17.)

On June 6, 2013, Odette Brown emailed Friskney the timeline that they had previously discussed on April 23 and 24. (Defs.' Ex. K, Doc. No. 59.)

On June 7, 2013, the very next day, Friskney sent a letter to Dexter Cummings stating he believed Plaintiff had violated the Agreement through its "blatant negligent performance," and therefore, he was "rescinding his signature" and terminating the Agreement in full. (Pl.'s Ex. D, Doc. No. 53.) Friskney indicated his grounds for rescission were Plaintiff's purposeful delay in providing the Sponsorship benefits, and the fact that time was of the essence because the Sponsorship was only set to last for two years. Friskney concluded his letter by stating his "decision [was] final and absolute," and the Agreement was now deemed "void." (Id.)

On June 14, 2013, Cummings emailed Friskney stating that it was Friskney who had in fact been unresponsive to Brown's repeated requests for information regarding the Sponsorship in the weeks immediately following execution of the Agreement. (See Defs.' Ex. N, Doc. No. 59 ("[O]ur Corporate Development Department's records (interactions are logged) indicate that Ms. Brown has made many attempts to schedule follow up calls with you and it was you who were unavailable.").) Cummings further stated that Plaintiff remained "ready, willing and able to perform its obligations under the Settlement Agreement," and that it expected Friskney to do the same. (Id.) Cummings concluded his email by stating that Friskney's failure to perform his obligations would be treated as a material breach of the Agreement. (Id.)

Friskney responded to Cummings that same day stating that Plaintiff was "already in material breach of the Settlement Agreement," and he believed Plaintiff's delay in conferring the Sponsorship benefits diminished the value of his consideration by more than $50,000. (Defs.' Ex. I, Doc. No. 59.)

On June 25, 2013, Friskney sent a formal "Breach of Contract Notice" to Dexter Cummings stating that Plaintiff breached Paragraph 7 of the Agreement, which pertained to FFT's Sponsorship. In his notice, Friskney stated he was giving Plaintiff thirty (30) days from the date of his previous notice (i.e., June 7, 2013) to cure its breach. Friskney specified that the only way Plaintiff could cure its alleged breach was to pay him $50,000 to make up for the lost time under the Sponsorship. (Defs.' Ex. L, Doc. No. 59.) Friskney indicated that if Plaintiff did not pay the $50,000 by July 7, 2013, he would take legal action. (Id. at ¶ 5.)

On June 27, 2013, two days later, Plaintiff filed its complaint. Plaintiff also filed a "Notice of Filing of Registrar Certificate" with GoDaddy advising of this litigation, and instructing GoDaddy not to permit the "transfer, suspension or other modification" of the domain names "americandiabetes.com" and "americandiabetesupplies.com" until further order of this Court. (Pl.'s Ex. J, Doc. No. 53.) GoDaddy placed the domain names on a temporary "registrar lock" such that the names could not be "transferred, modified or otherwise managed or manipulated." (Id. at 3 ¶ 4.)

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions,

conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   ANALYSIS

### A.  Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims[9]

1.  Defendants' Breach of Contract Counterclaim

Plaintiff first argues that it is entitled to summary judgment on Defendants' counterclaim for breach of contract because a party in breach may not complain about the other party's failure to perform on a contract. Specifically, Plaintiff argues that Friskney materially breached Paragraph 5 of the Agreement by (1) registering "americandiabetesupplies.com" with GoDaddy

---

[9] In analyzing Plaintiff's motion, I will view the evidence in the light most favorable to Defendants, the non-moving parties, and resolve all reasonable inferences in their favor.

on May 5, 2013, and (2) posting references to "American Diabetes" on Facebook and Twitter beyond the April 15, 2013 deadline. (Pl.'s Mot. Summ. J. 3–7.) Because Friskney admitted in his deposition that he registered "americandiabetesupplies.com," and acknowledged that employees within his organization made reference to "American Diabetes" on Facebook in May and June 2013, Plaintiff argues that there are no genuine disputes of material fact regarding Friskney and FFT's material breaches of Paragraph 5 of the Agreement. (Friskney Dep. 55:20–22; 56:1–3; Tr. of Oral Argument, 33:4–9, 13–17.)

Friskney does not dispute that he engaged in conduct that was directly contrary to the terms of paragraph 5 of the Agreement. Rather he responds that Dexter Cummings consented to his registering the domain name "americandiabetesupplies.com." Friskney also contends that he substantially performed under the Agreement, and thus his conduct does not rise to the level of a "material breach."[10] Lastly, Friskney argues that Plaintiff breached the Agreement first, on March 12, 2013—the date of execution—by failing to confer the agreed upon Sponsorship benefits. (Defs.' Resp. 8, 13–15, Doc. No. 60.) Friskney makes this argument despite acknowledging elsewhere in his brief that the earliest Plaintiff typically confers initial sponsorship benefits is two weeks after a sponsorship agreement is executed. (Id. at 4 ("[Plaintiff] takes two weeks to provide a sponsor benefits." (citing Brown Dep. 19:4, 18–20)).)

Paragraph 24 of the Agreement states that it "shall be construed in accordance with the laws of the Commonwealth of Pennsylvania." (Agreement, p. 11 ¶ 24.) Under Pennsylvania law, a claim for breach of contract requires that a plaintiff establish (1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant

---

[10] Without any reference to, or support from the record, other than his own self-serving assertions, Friskney states that he transferred some of the domain names outlined in Paragraph 5(f) of the Agreement, changed the names of his social media accounts, filed a name change for American Diabetes Services with the State of Florida, and dissolved "American Diabetes Services." (Defs.' Resp. 13.)

damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003); Pa. Supply, Inc. v. Am. Ash Recycling Corp. of Pa., 895 A.2d 595, 600 (Pa. Super. 2006). There is no dispute that the Settlement Agreement constituted a legally enforceable contract.[11] Rather, it is the second element—whether a breach occurred, and if so, whether that breach was material—that is in dispute.

State law controls whether a breach is material. In re Gen. DataComm Indus., Inc., 407 F.3d 616, 627 (3d Cir. 2005). "If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party." Seneca Res. Corp. v. S & T Bank, 122 A.3d 374, 379-80 (Pa. Super. 2015) (emphasis added); see also Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. 2003) (noting it is "a settled principle of contract law [in Pennsylvania that] a material breach by one party to a contract entitles the non-breaching party to suspend performance"). However, if a breach is an immaterial or "simple" failure of performance, and the contract was substantially performed, the contract remains effective. Sands v. Wagner, 2006 WL 1094555, *2 (M.D. Pa. Apr. 25, 2006).

Pennsylvania precedent reflects that the materiality of a breach is generally an issue of fact to be decided by a jury. Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1272 (Pa. Super. 2012). Nevertheless, Pennsylvania appellate courts have affirmed lower courts' findings of materiality as a matter of law where the breach goes directly to the essence of the contract. See e.g., Manning v. Kelly, 2015 WL 9464459, at *13 (Pa. Super. 2015) (affirming the trial court's decision that "the breach of the [agreement] was material as a matter of law"

---

[11] Plaintiff did not include a breach of contract claim against Medvantage because Medvantage was not a party to the Settlement Agreement. Nevertheless, Medvantage has joined Friskney and FFT in filing a counterclaim for breach of contract against Plaintiff. I will grant Plaintiff's motion for summary judgment on Defendants' counterclaim for breach of contract as it relates to Medvantage for failure to satisfy the first element of a *prima facie* claim of breach—existence of a contract.

because the "essential purpose of the [agreement] was … effectively rendered … a nullity."); see also Oak Ridge Const. Co. v. Tolley, 504 A.2d 1343, 1348-49 (Pa. Super. 1985) ("Under these circumstances, we find that [the plaintiff's] breach constituted a material failure of performance thereby discharging the [defendants] from all liability under the contract.").

The Pennsylvania Supreme Court has declared that it has

> no difficulty in concluding that when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice…. Such a breach is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate. We find our law does not require a non-breaching party to prolong a contractual relationship under such circumstances.

LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 652 (Pa. 2009).

The United States Court of Appeals for the Third Circuit has also acknowledged that a "breach is material when it goes to the essence of a contract," and "if the materiality question in a given case admits of only one reasonable answer (because the evidence … is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92–93 (3d Cir. 2008) (emphasis added). Thus, in certain situations, Pennsylvania courts and the Third Circuit have concluded that it can be appropriate to answer the materiality inquiry as a matter of law. See also KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 797 (E.D. Pa. 2011) (acknowledging summary judgment is appropriate if the materiality inquiry admits of only one reasonable answer).

Pennsylvania courts employ a multi-factor materiality analysis outlined in the Restatement (Second) of Contracts to determine whether a breach is "simple" or "material." Int'l

Diamond Importers, Ltd., 40 A.3d at 1273. According to the Restatement, there are five factors that courts should consider in evaluating whether a particular breach is material:

(a) the extent to which the injured party will be deprived of the benefit which it reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

(c) the extent to which the party failing to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement § 241; Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 468 (Pa. Super. 2003). These factors are applied "in the light of the facts of each case in such a way as to further the purpose of securing for each party [its] expectation of an exchange of performances. [Section 241] therefore states circumstances, not rules, which are to be considered in determining whether a particular failure is material." Restatement § 241 cmt. a. "No single factor is dispositive." Norfolk S. Ry. Co., 512 F.3d at 92.

Applying this framework to Friskney's social media posts, I conclude that this breach goes directly to the essence of the contract, and that no reasonable fact finder could conclude that his actions did not rise to the level of a material breach.

As noted above, in examining materiality, the first factor looks at the benefit bargained for. Norfolk S. Ry. Co., 512 F.3d at 93. Here, a central section of the Agreement, Paragraph 5(c), mandated that Friskney and FFT "cancel, delete, terminate and otherwise remove all reference" to their use of "AMERICAN DIABETES" "on all social media channels," which included Facebook. (Agreement, p. 6 ¶ 5(c) (emphasis added).) Friskney was required to undertake all

appropriate measures to accomplish this by April 15, 2013. (Id.) Not only did Friskney's prior posts referencing "American Diabetes" remain beyond the April 15 deadline, but on May 29, 2013, May 30, 2013, June 3, 2013, June 4, 2013, and June 5, 2013, Friskney and FFT's Facebook account contained several *new* postings that referenced "American Diabetes." (Pl.'s Ex. F, p. 13, Doc. No. 53.) As noted previously, Defendants concede that employees within Friskney's organization made these posts. (Friskney Dep. 91:20–22; 92:1–5; Tr. of Oral Argument, 33:4–9, 13–17.)

Defendants' response is that Plaintiff "has not provided proof of any harm suffered by it," and therefore, this factor weighs against a finding of a material breach. (Defs.' Resp. 17, Doc. No. 60.) The appropriate inquiry is not measurable harm. Rather, the first factor simply asks whether the injured party was deprived of the benefit which it reasonably expected. Plaintiff contracted with Friskney and FFT to remove or otherwise delete all reference to "American Diabetes" on social media by April 15, 2013. It is undisputed that Friskney's organization violated this prohibition just a few weeks later. Accordingly, any reasonable fact finder would come to only one conclusion—Plaintiff was deprived of the benefit for which it reasonably expected, and expressly bargained for. This first factor therefore weighs heavily in favor of finding materiality as a matter of law.

The Restatement's second factor, adequate compensation, is a "corollary of the first," and when a failure to perform is a breach, "the injured party always has a claim for damages, and the question becomes one of the adequacy of that claim to compensate [it] for the lost benefit." Restatement § 241 cmt. c. Because the Agreement between Plaintiff and Defendants involved a promise not to do something (as opposed to a sale of goods or an exchange of money), this factor is somewhat elusive as applied to the facts of this case. As such, I will not afford this factor

significant weight. See Brown v. Grass, 544 F. App'x 81, 86 (3d Cir. 2013) (emphasizing that the materiality analysis is flexible and imprecise, and that Pennsylvania courts have "not mandated that consideration of all five factors is required in every case").

Regarding the third factor, the extent to which Friskney and FFT would suffer forfeiture, "there is a risk of forfeiture when the breaching party has relied substantially on the expectation of the exchange, as through preparation or performance." Norfolk S. Ry. Co., 512 F.3d at 94. For this reason, "a failure is less likely to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such reliance." Restatement § 241 cmt d.

Here, Friskney and FFT agreed to remove all references to "American Diabetes" by April 15, 2013—slightly over one month after executing the Agreement. Rather than comply with this clear term, Friskney chose to supplement his Facebook account with additional posts, and did so early in the Agreement. The fact that Friskney and Plaintiff had entered into a two-year sponsorship agreement only serves to undermine his "expectation of the exchange."

Friskney urges that if Plaintiff is discharged from its obligations under the Agreement, it will have "simply ripped off Friskney's two-year benefit of being a sponsor, which is valued at $100,000 a year." (Defs.' Resp. 17, Doc. No. 60.) Friskney misapplies the third factor, which requires that I assess what "preparation or performance" *Friskney* had already undertaken, and ask whether forfeiture of that preparation or performance would be unjust (i.e., tilt in favor of a non-material breach due to substantial performance).

To the extent that Friskney does point to evidence of his "preparation or performance," that evidence is insubstantial. Friskney stresses that he filed the necessary "name change" papers for ADS with the state of Florida, undertook "acts" in order to change the names of his social

media accounts, and transferred certain domain names back to Plaintiff. Actual evidence of these steps could be easily produced. But Friskney has not specified, set forth, or produced *any* documents or communications that he transmitted to Facebook or the state of Florida, nor has he specified which domain names, and how many, he transferred to Plaintiff. (Defs.' Resp. 14–15, 18, Doc. No. 60; Friskney Aff. ¶¶ 12, 22.) Notwithstanding Friskney's affidavit, which represents the only piece of record evidence he cites in support of his general substantial performance argument, the "mere existence of a scintilla of evidence in support of [a party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [him]." Anderson, 477 U.S. at 252; see also Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002) ("An affidavit that is 'essentially conclusory' and lacking in specific facts is inadequate to satisfy the non-movant's burden" at the summary judgment stage). And, in any event, even if Friskney did file the appropriate "name change" papers with Facebook, it did not relieve him of his obligation not to post *new* references to "American Diabetes" on social media.

Because Friskney's breach came early in the life of the contract, and he has not pointed to any substantial preparation or performance, the third factor weighs in favor of finding a material breach as a matter of law.

The fourth factor asks "whether it is likely that the breaching party will perform [his] contractual duties going forward, not merely whether such performance is theoretically possible." Norfolk S. Ry. Co., 512 F.3d at 95. Friskney points out that he told Plaintiff he would accept Plaintiff's attempts to cure its alleged default under the Agreement—by paying him $50,000. (Defs.' Resp. 17, Doc. No. 60; Defs.' Ex. L, Doc. No. 59.) He states that Plaintiff's response to his offer was to instead sue just a few days later without curing any default. (Id.) I have considered this evidence but note that Friskney misconstrues the appropriate inquiry, which

is whether there was a likelihood of Friskney performing *his* contractual duties. Friskney attempted to "rescind [his] signature" from the Agreement on June 7, 2013, and further stated that the Agreement was deemed "void" and his decision to terminate the Agreement was "final and absolute." (Pl.'s Ex. D, Doc. No. 53.) These statements are not consistent with someone who is likely to perform his contractual obligations going forward. And Friskney's conduct must be viewed in conjunction with his blatant refusal to remove his social media posts referencing "American Diabetes." Given all of these undisputed facts, I conclude that no reasonable fact finder would find that Friskney was likely to perform his contractual duties. This factor also weighs in favor of Friskney's breach being material as a matter of law.

The fifth and final factor—the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing—"is a significant circumstance in determining whether the failure is material." Restatement § 241. cmt. f. Friskney argues that this factor weighs against a finding of a materiality because he acted in good faith. (Defs.' Resp. 17–18, Doc. No. 60.) I disagree, and conclude that the undisputed facts of record reflect anything but a "good faith" effort on Friskney's part to uphold his end of the bargain.

On March 14, 2013 (two days after executing the Agreement), Friskney threatened to sell "americandiabetes.com" to one of several entities that had "American" or "Diabetes" in its organizational name, and warned that Plaintiff might have to "kiss the domains goodbye." (Pl.'s Ex. B, Doc. No. 53.) Friskney did this despite the fact that Paragraph 5(e) required him to transfer that very domain name to Plaintiff by January 15, 2014. (Agreement, p. 6 ¶ 5(e).)

Friskney's subsequent postings of "American Diabetes" on social media, viewed in the context of the first trademark infringement dispute, which was settled via the Agreement at issue, must also be considered in evaluating Friskney's conduct, and whether his actions align with

notions of good faith and fair dealing. As noted previously, Friskney/FFT expressly agreed to remove all reference to "American Diabetes" on social media. Rather than uphold this integral part of the bargain, Friskney affirmatively posted that very phrase—several times—just weeks after executing the Agreement. This certainly does not exhibit "good faith."

In sum, after weighing all of the Restatement factors, I conclude that no reasonable fact finder could find that Friskney's social media postings of the very mark prohibited by the Agreement did not amount to a material breach. Friskney's breach went directly to the essence of the contract, and thus, as a matter of law, is material. Norfolk S. Ry. Co., 512 F.3d at 93. Paragraph 10 of the Agreement supports this conclusion, and states that by January 30, 2014, Friskney would serve upon Plaintiff a written statement, "under oath and penalty of perjury, setting forth that [he has] fully complied with [the] Agreement, and in particular Paragraph 5, in all respects." (Agreement, p. 8 ¶ 10.)

I turn next to Friskney's registering of "americandiabetessupplies.com" on May 5, 2013. On this issue, Friskney and FFT argue that this was not a breach of the Agreement at all, let alone a material one, because Dexter Cummings told Friskney during a telephone conversation that he could set up a temporary commerce site to later be turned over with "americandiabetes.com." (Defs.' Resp. 13, Doc. No. 60.)

Plaintiff responds by highlighting the language of Paragraph twenty (20) of the Agreement, which states that the Agreement constitutes the entire agreement between the parties, and any subsequent modification or waiver must be in writing. (Pl.'s Reply 2–4, Doc. No. 61.) Therefore, Plaintiff posits that Cummings' statement, even as alleged by Friskney, could not

have modified the Agreement in light of the parol evidence rule.[12] As such, prior to determining whether Friskney's registration of "americandiabetesupplies.com" also constitutes a material breach of the Agreement as a matter of law, I must first consider the parol evidence rule.

In Pennsylvania, the purpose of the parol evidence rule is to

> preserve the integrity of written agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous or prior oral declarations. The parol evidence rule in Pennsylvania holds that where parties … have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract.

Hamilton Bank v. Rulnick, 475 A.2d 134, 136 (Pa. Super. 1984); see also Iron Worker's Sav. & Loan Ass'n v. IWS, Inc., 622 A.2d 367, 372 (Pa. Super. 1993) ("Where the alleged prior or contemporaneous oral representations … concern a subject which is specifically dealt with in the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that in the absence of fraud, accident or mistake the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.").

"[F]or the parol evidence rule to apply, there must be a writing that represents the 'entire contract between the parties.'" Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004). "To determine whether or not a writing is the parties' entire contract, the writing must be looked at and 'if it appears to be a contract complete within itself, couched in such terms as [to] import a complete legal obligation without any uncertainty as to the object or extent of the

---

[12] At deposition, Cummings denied that he told Friskney that he approved of Friskney registering "americandiabetesupplies.com." Rather, he stated that he told Friskney that Friskney would need speak to Odette Brown about the issue. (Cummings Dep. 36:10–22.)

[parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties[.]'" Id. at 436 (quoting Gianni v. R. Russel & Co. (State Report Title: Gianni v. R. Russell & Co.), 126 A. 791, 792 (Pa. 1924)). "An integration clause which states that a writing is meant to represent the parties' entire agreement is … a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Id. at 436; Kehr Packages, Inc. v. Fid. Bank, Nat. Ass'n, 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998).

Here, paragraph 20 of the Agreement states that "[t]his Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties." (Agreement, pp. 10–11 ¶ 20.) It is thus clear that the Agreement under consideration is a complete expression of the parties' legal obligations, and fully integrated. Therefore, the parol evidence rule bars consideration of any prior or contemporaneous oral agreements between Dexter Cummings and Friskney with respect to registering "americandiabetesupplies.com."

On this point, it is important to note that Friskney testified at his deposition that he registered "americandiabetesupplies.com" "in order to set up a temporary e-commerce site pursuant to a conversation that Mr. Cummings and [Friskney] had a while ago."  (Friskney Dep. 55:20–22; 56:1–13.) When asked to clarify what "a while ago" meant, Friskney stated that the conversation occurred "[b]efore we even signed the settlement agreement…. [I]t had to be before March 12th." (Id. at 56:6–8).[13] "A party cannot justifiably rely upon prior oral representations,

---

[13] In his brief in opposition to Plaintiff's motion for summary judgment, Friskney provided a different date and contends that the conversation in which Cummings consented to use of "americandiabetesupplies.com" occurred *on* March 12, 2013—the date of execution. The affidavits relied upon by Friskney also indicate that this conversation occurred *on* March 12, 2013. See Friskney Aff. ¶¶ 1–7; Sacks Aff. ¶¶ 1–8; Coleman Aff. ¶¶ 1–8; Prosser Aff. ¶¶ 1–8, Defs.' Ex. M, Doc. No. 62.)  Despite these inconsistencies, the parol evidence rule makes clear that contemporaneous oral representations are

yet sign a contract denying the existence of those representations." <u>Iron Worker's Sav. & Loan Ass'n</u>, 622 A.2d at 372.

Having concluded that the parol evidence rule bars consideration of any alleged prior or contemporaneous oral agreement between Cummings and Friskney, I turn to the question of whether or not Friskney breached the Agreement by registering the domain name "americaniabetessupplies.com." Under the Agreement, Friskney agreed that he would "immediately cease and refrain from forever using AMERICAN DIABETES … alone or [in] <u>combination with other words</u>, phrases, symbols, or designs, as a … <u>domain name component</u>[.]" (Agreement, p. 5 ¶ 5) (emphasis added). Despite this clear term, it is undisputed that Friskney registered "americandiabetessupplies.com" on May 5, 2013. This domain name includes the phrase AMERICAN DIABETES, "in combination with other words," and as a "domain name component."

For the same reasons outlined above pertaining to the social media posts, Friskney's registering of "americandiabetessupplies.com" constituted a material breach of the Agreement as a matter of law. Any reasonable fact finder would conclude that Plaintiff was deprived of the benefit for which it reasonably expected, and for which it expressly bargained. Friskney will not suffer any significant forfeiture because this breach occurred "early" in the parties' contractual relationship—less than two (2) months after executing the Agreement. And, as discussed *supra*, Friskney gave no indication that he was likely to cure his breaches because he considered the Agreement "void" unless Plaintiff was willing to pay him $50,000. Nor is there any record

---

also barred. See <u>Kehr Packages, Inc. v. Fid. Bank, Nat. Ass'n</u>, 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998) (concluding that an oral agreement made during execution of a written agreement is "contemporaneous" with that written agreement, and therefore subject to the parol evidence rule). Therefore, I will not consider the affidavits cited by Friskney as part of the summary judgment record. Nor will I consider Defendants' "Motion for Permission to File a Post-Argument Memorandum on the Pending Motions for Summary Judgment" (Doc. No. 89). The record has been closed for several months, yet Defendants now seek to introduce new arguments about the effect of a *post*-contract verbal amendment.

evidence from which a reasonable fact finder could conclude that his conduct comported with standards of good faith and fair dealing.

Having found two material breaches as a matter of law, Plaintiff's motion will be granted as it relates to Defendants' breach of contract counterclaim because a material breach by one party relieves the non-breaching party of its contractual obligations. Seneca Res. Corp., 122 A.3d at 379-80; see also Umbelina v. Adams, 34 A.3d 151, 159 (Pa. Super. 2011) ("Pennsylvania courts have long recognized the general principle of contract law providing that a material breach of a contract, which is vital to the existence of the contract, relieves the non-breaching party from any continuing duty of performance under the contract.") (emphasis omitted).

  2.  Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim for Reverse Domain Name Hijacking

Defendants have also brought a counterclaim against Plaintiff for reverse domain name hijacking (Count II). Defendants rely on the "registrar lock" that was placed on "americandiabetes.com" by GoDaddy at Plaintiff's request in support of this counterclaim. Plaintiff seeks summary judgment, arguing that Defendants have failed to establish the necessary elements under the Anti-Cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1114(2)(D)(v). This statute provides a cause of action to a "domain name registrant who is aggrieved by an overreaching trademark owner" and allows the registrant to seek a judgment "to declare that the domain name registration or use by the registrant is not unlawful under the Lanham Act and to obtain injunctive relief for return of the domain name." Hawes v. Network Solutions, Inc., 337 F.3d 377, 384 (4th Cir. 2003) (citations omitted). In simple terms, the statute affords protection to a domain name registrant who is improperly targeted by an overzealous trademark owner claiming the registered domain name infringes on the trademark owner's mark.

To state a claim for reverse domain name hijacking, a claimant must establish:

> (1) that it is a domain name registrant; (2) that its domain name was suspended, disabled, or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II); (3) that the owner of the mark that prompted the domain name to be suspended, disabled, or transferred has notice of the action by service or otherwise; and (4) that the plaintiff's registration or use of the domain name is not unlawful under the Lanham Act, as amended.

Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona, 330 F.3d 617, 626-27 (4th Cir. 2003). Failure to satisfy any one of these four elements will be "fatal to recovery." Hawes, 337 F.3d at 385.

Plaintiff contends that no facts exist demonstrating that the "americandiabetes.com" domain name was suspended, disabled, or transferred, and thus Defendants have failed to satisfy the second element of their *prima facie* case. (Pl.'s Mot. Summ. J. 11.) Plaintiff emphasizes that a domain name placed on a "registrar lock" cannot be "transferred, modified, or otherwise managed or manipulated." (Pl.'s Ex. J, Doc. No. 53.) Plaintiff explains that placing the domain name on a registrar lock was "vitally important" because of Friskney's threat to sell "americandiabetes.com" to a third party. (Pl.'s Ex. B, Doc. No. 53.) Indeed, Plaintiff's Notice of Filing of Registrar Certificate expressly instructed GoDaddy *not* to permit the suspension or transfer of the "americandiabetes.com" domain name. (Pl.'s Ex. J, Doc. No. 53.)

Plaintiff also highlights Friskney's deposition testimony wherein he admitted that "GoDaddy has not prevented [him] from offering to sell [his] products on a website using the americandiabetes.com domain name." (Friskney Dep. 71:8–13.) Because the plain text of the statute requires that a domain *name* be "suspended, disabled, or transferred" under § 1114(2)(D)(v), Plaintiff argues there are no material facts in dispute to suggest that the domain *name* was disabled. (Pl.'s Reply 8, Doc. No. 61.)

Friskney responds that his "loss of the right to transfer, update, renew, or delete" the domain name "americandiabetes.com" in effect "disabled his use of the domain [name]," with the "inability to renew having the most dramatic impact." (Defs.' Resp. 20, Doc. No. 60.) He further argues that the lock prevented him from entering into contracts with other companies, thus impeding his ability to conduct business operations. (Id.)

I previously denied Plaintiff's motion to dismiss Defendants' counterclaim for reverse domain name hijacking, concluding that a "registrar lock" could plausibly be construed as disabling or suspending a website's domain name. (See Doc. No. 39, p. 7 n.2.) In doing so, however, I expressly instructed Friskney to be prepared to address the issue of a "registrar lock" and its impact on a domain name at the summary judgment stage. In their one-page discussion of their reverse domain name hijacking counterclaim, Defendants fail to cite any authority to support their argument that the domain name was "disabled" or "suspended." Rather, they state that Friskney will prove at trial that the "registrar lock" constituted disablement for purposes of satisfying the second element of their claim. (Defs.' Resp., 20, Doc. No. 60). This is not sufficient. At the summary judgment stage, Friskney is required to rebut Plaintiff's evidence by "citing to particular parts of materials in the record" that demonstrate a genuine dispute of a material fact. Fed. R. Civ. P. 56(c)(1)(A); Anderson, 477 U.S. at 250.

The Supreme Court of the United States has repeatedly held that the "authoritative statement" in cases involving statutory interpretation is the statutory text. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005). Here, the statutory text makes clear that it is a domain *name* which must be disabled, transferred, or suspended. 15 U.S.C. § 1114(2)(D)(v). Defendants have not cited to any record evidence creating a genuine dispute as to whether the domain *name* "americandiabetessupplies.com" was disabled, transferred, or suspended.

Moreover, even when viewed in the light most favorable to Defendants, the limited precedent available involving claims for reverse domain name hijacking does not support Defendants' arguments that an inability to obtain an investor, or renew a domain name at a future point in time, constitutes evidence that a domain name itself is presently disabled. See Hawes v. Network Sols., Inc., 337 F.3d 377, 384 (4th Cir. 2003) (noting that congressional reports indicate the ACPA is meant to provide a cause of action when a domain name has been suspended, *cancelled*, or transferred (citing H.R. Rep. No. 106–412, at 15 (1999); S. Rep. No. 106–140, at 11 (1999)); Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 29–30 (1st Cir. 2001) ("[Section 1114(2)(D)(v)] is best understood as creating a protection for registrants to counteract abusive behavior by trademark holders. And this abusive behavior is best understood to include administrative dispute resolution proceedings under the [Uniform Domain Name Dispute Resolution Policy ("UDRP")] where those proceedings are intended … to strip a domain name from a registrant who has lawfully registered and used that domain name."); Dluhos v. Strasberg, 321 F.3d 365, 373 (3d Cir. 2003) (noting a registrant may sue for the return of a lost or deactivated domain name).

Application of the statutory text and available precedent reveals that Defendants have failed, as a matter of law, to make out a *prima facie* claim of reverse domain name hijacking. Accordingly, I will grant Plaintiff's motion for summary judgment as to this counterclaim.

### B.   Friskney and FFT's Motion for Summary Judgment on Liability[14]

Defendants Friskney and FFT assert that Plaintiff's trademark infringement, false designation of origin, cyberpiracy ("cybersquatting"), and unfair competition claims are barred by the doctrine of laches. Friskney and FFT further argue that they are entitled to judgment on

---

[14] Because Plaintiff is now the non-moving party, I will view the evidence in the light most favorable to Plaintiff, and resolve all reasonable inferences in its favor.

Plaintiff's breach of contract claim because Plaintiff admitted that it did not perform its Sponsorship obligations under Paragraph 7, which constituted a material breach of the Settlement Agreement. (Friskney & FFT Mot. Summ. J. 2, 9.)

      1.  <u>Plaintiff's Breach of Contract Claim</u>

Friskney and FFT press that they should prevail on Plaintiff's breach of contract claim as a matter of law because Plaintiff failed to confer any of the Sponsorship benefits outlined under the Sponsorship and Paragraph 7 of the Agreement, and therefore, Plaintiff breached the Agreement first. (<u>Id.</u> at 9–16.) Defendants ignore, however, the undisputed evidence where multiple emails were sent by Plaintiff's agent, Odette Brown, to Friskney in an attempt to set up an initial conference call to discuss FFT's Sponsorship. (Pl.'s Ex. A-1, Doc. No. 70.) This evidence also establishes that it was *Friskney* who asked to reschedule the initial conference call, and when Brown subsequently called Friskney, he did not answer or return her calls. (<u>Id.</u>; Brown Decl. ¶¶ 22–23; Tr. of Oral Argument, 31:1-6.)

On April 23, 2013, approximately three weeks later, having not heard back from Friskney, Brown again emailed him asking to "touch base [about] the deliverables [i.e., the timeline] for the sponsorship." (Pl.'s Ex. A-2, Doc. No. 70.) Friskney responded the next day, and asked whether new sponsors receive a "welcome package." Despite it being customary for new sponsors to have an initial telephone conversation with Brown, she offered instead to prepare the initial timeline and send it to Friskney. (<u>Id.</u>; Brown Decl. ¶¶ 11–12.) Again, all of these facts are undisputed.

Friskney points out that Brown did not send the Sponsorship timeline until June 6, 2013, several weeks later. However, Friskney registered "americandiabetesupplies.com" on May 5, 2013—a month *before* he received the timeline, and a mere eleven (11) days after Brown offered

to prepare it. Thus, the only possible reason to accept Friskney's argument (that Plaintiff materially breached first) would be to examine the eleven-day window between when Brown stated on April 24, 2013 that she would send the timeline to Friskney, and when Friskney registered "americandiabetesupplies.com" on May 5, 2013. In other words, the appropriate inquiry is: could a reasonable fact finder conclude that Brown's eleven-day delay constitutes a material breach of the Agreement? For several reasons, the undisputed evidence of record reflects that this question must be answered in the negative, necessitating denial of Defendants' motion.

First, the Agreement and Sponsorship were both silent as to specific dates for Sponsorship deliverables. Brown's undisputed deposition testimony explains this process:

> Q: [A]fter you get a new assignment for a new sponsor, what do you do step by step as you take them through the beginning process of being a sponsor?
>
> A: We generally try to set up a time, conference call or in-person visit … to go through the elements of the sponsorship, the benefits, because we need to determine the timing for some of the benefits…. So, logistics mostly.
>
> …
>
> Q: How long does it typically take after you get the assignment that someone's a new sponsor, between the date when you first get the assignment until they become a recognized sponsor of [Plaintiff]?
>
> A: It really depends on the client, because it requires that we obtain certain information from the client as well as us conveying what we're able to do.
>
> …
>
> Q: What's the quickest timeframe you've seen on delivery of the benefits?
>
> A: It really depends, again, on the responsiveness of the client…. [W]e allow up to about two weeks to try to get information up and running on – on our website, for example, if it's website

> recognition…. And that's provided we have the information
> needed to put up on the website.

(Brown Dep. 15:3–7, 8–22; 17:14–18; 19:6–17.)

In short, even with a cooperative, responsive client—which Friskney was not—a sponsorship necessitates an exchange of certain information. Applying the <u>Restatement</u> factors, discussed *supra*,[15] no reasonable fact finder could conclude that an eleven-day deprivation of Sponsorship benefits, even as alleged by Defendants, creates a material breach of the Agreement. Indeed, Defendants acknowledge that it typically takes *two weeks* to confer Sponsorship benefits. (Friskney & FFT Mot. Summ. J. 13, Doc. No. 62 ("[Plaintiff] takes two weeks to provide a sponsor benefits") (citing Brown Dep., 19:4, 18–20).) Yet, within this timeframe, Friskney materially breached the Agreement on May 5, 2013 when he registered "americandiabetesupplies.com."

Moreover, Plaintiff stood ready to attempt to cure any alleged breach, which pertains to the fourth factor in the <u>Restatement</u> materiality analysis. Even after Friskney accused Plaintiff of breach on June 7, 2013, Dexter Cummings stated to Friskney that Plaintiff stood "ready, willing and able to perform its obligations under the Settlement Agreement," and remained "committed to working through this [disagreement]." (Defs.' Ex. N, Doc. No. 62.) And finally, as of May 5, 2013, there is simply no record evidence from which a reasonable fact finder could conclude that Plaintiff exhibited behavior not comporting with standards of good faith and fair dealing. Brown reached out to Friskney shortly after the Agreement was executed, and followed up multiple

---

[15] <u>See</u> p. 13.

times to no avail. Therefore, no reasonable fact finder could conclude that Plaintiff materially breached the Agreement as of May 5, 2013.[16]

One final point also warrants attention. Paragraph 7, the Sponsorship paragraph relied upon by Friskney and FFT, was "[s]ubject to Paragraph 5." (Agreement, p. 7 ¶ 7.) "[A] condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises." Acme Markets, Inc. v. Fed. Armored Exp., Inc., 648 A.2d 1218, 1220 (Pa. Super. 1994); Boro Const., Inc. v. Ridley Sch. Dist., 992 A.2d 208, 216 (Pa. Commw. Ct. 2010) (concluding that work be performed "subject to" approval of an architect created a condition precedent); but see Vill. Beer & Beverage, Inc. v. Vernon D. Cox & Co., 475 A.2d 117, 122 (Pa. Super. 1984) ("[A] condition precedent and a condition subsequent are fundamentally different: a condition precedent must occur before performance under a contract arises, while a condition subsequent acts to discharge a contractual duty after it has already occurred."). Because Paragraph 7 stated that FFT's Sponsorship benefits commenced on the effective date of the Agreement (March 12, 2013), I will construe the language of Paragraph 7 as creating a condition subsequent because Plaintiff's duty to provide Sponsorship benefits arose on the date of execution. Thus, once Friskney breached, Plaintiff's duties were discharged, as opposed to never having arisen. That said, whether Paragraph 7 created a condition precedent or a condition subsequent yields the same result—Friskney materially breached the Agreement first, which forecloses his ability to sue for breach.

Given all of the above, I conclude that as of May 5, 2013—the date of Friskney's first material breach—there is no evidence from which a reasonable fact finder could conclude that Plaintiff materially breached the Agreement. For these reasons, I will deny Defendants' motion

---

[16] Defendants further fail to address the undisputed fact that Friskney and FFT did not remove their Facebook posts referencing "American Diabetes" by the April 15 deadline, which *preceded* the email communications between Brown and Friskney pertaining to the Sponsorship timeline on April 23 and 24.

for summary judgment on Plaintiff's breach of contract claim. Because Plaintiff has not moved for summary judgment on its breach of contract claim, Friskney and FFT will be ordered to show cause pursuant to Federal Rule of Civil Procedure 56(f)(1)[17] as to why judgment in favor of Plaintiff on its breach of contract claim is not appropriate.

### 2.   Plaintiff's Lanham Act and Unfair Competition Claims

I next address Friskney and FFT's argument that Plaintiff's Lanham Act and state-law unfair competition claims are barred by the doctrine of laches. As noted previously, Plaintiff has brought three separate Lanham Act claims: trademark infringement under § 32(1) (Count II); false designation of origin under § 43(a) (Count III); and, cyberpiracy ("cybersquatting") under § 43(d) (Count IV). (Compl. ¶¶ 48–72.)

The Lanham Act does not contain a statute of limitations. Rather, analysis regarding delay in bringing such claims is subject to "principles of equity." Santana Products, Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 135 (3d Cir. 2005). Laches is one of several defenses to trademark infringement, and serves to bar both monetary relief and injunctive relief. Sanofi-Aventis v. Advancis Pharm. Corp., 453 F. Supp. 2d 834, 855 (D. Del. 2006). It is an "equitable bar to the prosecution of stale claims and stands for the proposition that those who sleep on their rights must awaken to the consequence that they have disappeared." Fulton v. Fulton, 106 A.3d 127, 131 (Pa. Super. 2014) (citations omitted).[18]

---

[17] "After giving notice and a reasonable time to respond, the court may … grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1).

[18] Where laches denotes merely passive consent, estoppel by acquiescence applies "when [a] trademark owner, by affirmative word or deed, conveys its implied consent to another" to use its name or mark. Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 804 (3d Cir. 1998). Defendants also argue that Plaintiff's claims are barred by estoppel by acquiescence. I will deny summary judgment on this ground because Defendants have not cited to any record evidence indicating that Plaintiff exhibited an "affirmative word or deed" to suggest approval of Defendants' use of the allegedly infringing marks.

Laches consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice to the defendant. In re Mushroom Transp. Co., Inc., 382 F.3d 325, 337 (3d Cir. 2004). The Third Circuit has generally followed the traditional practice of "borrowing the most analogous statute of limitations from state law" to determine whether the defense of laches may be properly invoked (i.e., whether a plaintiff has exhibited inexcusable delay). Island Insteel Sys., Inc. v. Waters, 296 F.3d 200, 206 (3d Cir. 2002). Once the analogous state statute of limitations expires for a Lanham Act cause of action, the defendant "enjoys the benefit of a presumption of inexcusable delay and prejudice." Santana, 401 F.3d at 138. In order to rebut this presumption, the plaintiff has the burden of proving both that the delay was excusable and that it did not prejudice the defendant. Id. at 139. Where the appropriate statute of limitations has not run, however, the defendant bears the burden of establishing its entitlement to laches. It is therefore critical to determine the most analogous state statute of limitations.[19]

Defendants rely upon Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co., 943 F. Supp. 509 (E.D. Pa. 1996) for the proposition that Pennsylvania's two-year statute of limitations for fraud should apply to all three of Plaintiff's Lanham Act claims, as well as its common law unfair competition claim, for purposes of laches. In Guardian Life, the district court did in fact apply Pennsylvania's two-year statute of limitations for fraud to the plaintiff's Lanham Act claims for trademark infringement under § 32 and false designation of origin under § 43, in addition to its common law unfair competition claim. 943 F. Supp. at 517. As such, Defendants urge that they are entitled to a presumption of both inexcusable delay and prejudice because at the very latest, Plaintiff knew of Defendants' allegedly infringing activities in September 2007, but did not file suit in the prior ADS litigation until June 2012—more than four

---

[19] Neither party discusses the Third Circuit's practice of borrowing the most analogous state statute of limitations. I see no reason to depart from the Third Circuit's instruction that district courts should rely on state law as the "primary guide" in this area. Island Insteel Sys., Inc., 296 F.3d at 207.

years later. (Friskney & FFT Reply 5, Doc. No. 75.) <u>Guardian Life</u>, however, is not the most recent pronouncement within the Third Circuit that discusses and identifies what the most analogous Pennsylvania statute of limitations is for Lanham Act claims.

The Third Circuit has more recently held that <u>all</u> claims brought under § 43(a) of the Lanham Act are most analogous to the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), which has a *six-year* "catch-all" limitations period. <u>Santana Products, Inc.</u>, 401 F.3d at 137. Here, Plaintiff has brought its claim for false designation of origin under the same section of the Lanham Act—43(a). Therefore, this claim is reviewed in the context of a six-year statute of limitations for purposes of laches. <u>See</u> <u>Cannella v. Brennan</u>, 2014 WL 3855331, at *2 (E.D. Pa. Aug. 6, 2014) (acknowledging that the UTPCPL's six-year statute of limitations applies to all claims brought under § 43(a)).

Regarding Plaintiff's § 32 trademark infringement claim, this claim is analyzed identically to an infringement claim brought under § 43(a) of the Lanham Act.[20] <u>See e.g.</u>, <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 454 F.3d 108, 114 (2d Cir. 2006); <u>see also</u> <u>Two Pesos v. Taco Cabana</u>, 505 U.S. 763, 780 (1992) (noting that the United States Supreme Court uses the same standard—the "likelihood of confusion" test—to determine whether there has been trademark infringement or false designation of origin); <u>A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 210 (3d Cir. 2000) (noting that courts within the Third Circuit measure federal trademark infringement and false designation of origin by "identical

---

[20] Section 32 governs claims for infringement of *registered* trademarks, whereas Section 43(a) governs claims for infringement of an *unregistered* trademark and also acts as "a broad federal unfair competition provision." <u>Malletier v. Dooney & Bourke, Inc.</u>, 561 F. Supp. 2d 368, 378 (S.D.N.Y. 2008).

standards").[21] Accordingly, for purposes of laches, I will also analyze Plaintiff's § 32 trademark infringement claim under a six-year statute of limitations.

I turn next to Plaintiff's cyberpiracy claim brought under § 43(d). The Anticybersquatting Consumer Protection Act (ACPA), which amended the Lanham Act, is intended to prevent the "bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks." Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002).

Unlike claims arising under § 43(a), for which the Third Circuit has expressly instructed that a six-year statute of limitations should be applied, no precedent within this circuit could be located that definitively articulates what the analogous Pennsylvania statute of limitations is for cyberpiracy under § 43(d). See also Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 438 (4th Cir. 2011) (noting that the court was "unaware" of any cases in which a laches defense was applied in the cyberpiracy context). Thus, a closer examination of the UTPCPL and other Pennsylvania causes of action is necessary to determine which state claim, and thus which state statute of limitations, is most analogous to a claim for cyberpiracy arising under § 43(d). See Island Insteel Sys., Inc., 296 F.3d at 208 (concluding that it is appropriate to borrow a limitations period under state law "on the basis of the substantive elements of the analogous state cause of action").[22] As noted, Defendants argue that the two-year statute of limitations for common law fraud should apply to all of Plaintiff's Lanham Act and unfair competition claims. (Friskney & FFT Mot. Summ. J. 3.)

---

[21] "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." Id. at 210.

[22] See also Petroliam Nasional Berhad v. GoDaddy.com, Inc., 737 F.3d 546, 552-53 (9th Cir. 2013) (noting that claims under traditional trademark law and the ACPA have distinct elements, and that the rights protected within the ACPA are distinct from those in other sections of the Lanham Act).

A successful claim for cyberpiracy requires that (1) the plaintiff's mark is distinctive or famous; (2) the defendant's domain name is identical or confusingly similar to plaintiff's mark; and (3) the defendant registered his domain name with the bad faith intent to profit from it.[23] Louis Vuitton Malletier & Oakley, Inc., 211 F. Supp. 2d at 582 (citing Shields v. Zuccarini, 254 F.3d 476, 483 (3d Cir. 2001)).

The elements of common law fraud in Pennsylvania are: (1) a representation (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by the reliance. Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa., 7 A.3d 278, 290 (Pa. Super. 2010).

In contrast, the UTPCPL states that "Unfair Methods of Competition" and "Unfair or Deceptive Acts or Practices" include:

      (i)        Passing off goods or services as those of another;

---

[23] In determining whether a person has a bad faith intent, a court may consider factors such as: (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous. 15 U.S.C. § 1125(d)(B)(i).

      (ii)    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

      (iii)    Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

…

      (xxi)    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

73 Pa. Stat. Ann. § 201-2(4)(i)-(xxi).

Examination of the elements of both common law fraud and the UTPCPL in conjunction with the cyberpiracy statute (ACPA) reflects that the cyberpiracy statute is more analogous to the UTPCPL.

In <u>Santana Products</u>, the Third Circuit underscored that, in addition to the element of scienter,[24] common law fraud in Pennsylvania requires proof of justifiable reliance. 401 F.3d at 137. While the "bad faith" element of a claim for cyberpiracy arising under § 43(d) arguably resembles scienter, largely due to it being described in the statute as "bad faith intent," and three of the nine factors courts may consider in ascertaining the existence of bad faith expressly include the word "intent," it is also true that there is no element of justifiable reliance required for a cyberpiracy claim arising under § 43(d).

In contrast, the UTPCPL covers a broader range of conduct, particularly in its "catch all" provision, subsection (xxi). The second element in a claim for cyberpiracy mandates that the domain name be "confusingly similar" to the plaintiff's mark. Subsections (ii), (iii), and (xxi) of the UTPCPL deal with a "likelihood of confusion" between a defendant's conduct and the plaintiff's mark. Subsection (i) deals with "passing off" goods or services as those of another, and in the context of cyberpiracy, the Third Circuit has explained that defendants will "often

---

[24] Scienter is a defendant's intention "to deceive, manipulate, or defraud." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007).

register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site[.]" <u>Shields</u>, 254 F.3d at 484. Lastly, subsection (xxi) deals not only with fraudulent conduct, thus encompassing the elements of scienter and justifiable reliance, but also with deceptive conduct which creates a likelihood of confusion or misunderstanding. Registering a domain name with the bad faith intent to profit from it—and further diverting customers from a mark owner's site to the cybersquatter's own site—certainly falls into the category of "deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi).

I thus conclude that a claim for cyberpiracy arising under § 43(d) is more analogous to the broad language of the UTPCPL than a common law claim for fraud. I reach this conclusion mostly because cyberpiracy does not include justifiable reliance as an element, but does contain within its elements language that comports with the various provisions of the UTPCPL—in particular, its "catch all" provision, subsection (xxi). 73 Pa. Stat. Ann. § 201-2(4)(xxi). I will therefore measure Plaintiff's cyberpiracy claim under the UTPCPL's six-year statute of limitations for purposes of laches. <u>See</u> <u>Fazio v. Guardian Life Ins. Co. of Am.</u>, 62 A.3d 396, 410 (Pa. Super. 2012) (noting the UTPCPL "encompasses an array of practices which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty").

I turn next to Plaintiff's claim for common law unfair competition. Under Pennsylvania law, claims for unfair competition are subject to a two-year statute of limitations. 42 Pa. Cons. Stat. Ann. § 5524(7); <u>Giordano v. Claudio</u>, 714 F. Supp. 2d 508, 523 n.7 (E.D. Pa. 2010). Accordingly, Plaintiff's state-law unfair competition claim will be subject to the two-year statute

of limitations as set forth under 42 Pa. Cons. Stat. Ann. § 5524(7).[25] See also Fazio, 62 A.3d at 411 (noting that Pennsylvania cases distinguish between common law claims and claims brought pursuant to the UTPCPL for purposes of fixing the appropriate limitations period).

Having concluded that Plaintiff's Lanham Act claims are subject to a *six-year* statute of limitations, and its state-law unfair competition claim is subject to a *two-year* statute of limitations, I will now examine whether Plaintiff exhibited inexcusable delay. As this analysis necessarily entails applying the analogous statute of limitations, I note that the statutory period begins to run when "the right to institute and maintain the suit arises." Beauty Time, Inc. v. VU Skin Sys., Inc., 118 F.3d 140, 144 (3d Cir. 1997) (quoting Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa.1983)). A plaintiff must therefore bring claims within the statutory period beginning when it knew or should have known that it had a cause of action. Beauty Time, Inc., 118 F.3d at 148.

Friskney cites to testimony from Dexter Cummings that Plaintiff had a prior relationship with ADS or at least knew of ADS's existence potentially going all the way back to 1999/2000. (Cummings Dep. 40:16–22.) Based solely on this testimony, Friskney argues that Plaintiff's failure to bring its infringement claims against ADS until twelve years later bars it, as a matter of law, from maintaining them now. Plaintiff also cites to Cummings' deposition testimony, in which he stated that he might have been "confusing different [companies]" and "mixing up the

---

[25] I note that my consideration of the statute of limitations as it pertains to federal and state unfair competition claims could be viewed as inconsistent. Except for the requirement of interstate commerce, the Pennsylvania common law tort of unfair competition mirrors a claim for federal unfair competition (brought under § 43(a) of the Lanham Act). Giordano, 714 F. Supp. 2d at 521. Courts have therefore found that violation of federal unfair competition under the Lanham Act necessarily warrants a finding of unfair competition under Pennsylvania common law. See e.g., Louis Vuitton Malletier & Oakley, Inc., 211 F. Supp. 2d at 582. Nevertheless, the Third Circuit has instructed that claims brought under Section 43(a) of the Lanham Act are subject to the UTPCPL's six-year statute of limitations, while the Pennsylvania common law tort of unfair competition, the elements of which are subsumed within a § 43(a) claim for federal unfair competition, is confined to a two-year statute of limitations.

two." (Cummings Dep. 45:13–14, 46:10–11.) Examination of Cummings' deposition testimony clearly reflects a factual dispute regarding whether he became aware of ADS's existence in 1999/2000.[26]

Undisputed record evidence *does* establish, however, that Plaintiff had knowledge of ADS and "americandiabetes.com" in September 2007. (Cummings Dep. 40:11–15, Pl.'s Ex. B-6, Doc. No. 70.) A string of emails from September 20, 2007 and September 21, 2007 reveals that Dexter Cummings, Odette Brown, and several other ADA employees discussed the existence of ADS's website, "americandiabetes.com." (Pl.'s Ex. B-6, Doc. No. 70.) Cummings emailed the group stating that Plaintiff would "send a cease and desist letter." (Id.) However, the matter was "inadvertently dropped." (Cummings Decl. ¶¶ 12–20.)

Plaintiff filed its initial lawsuit against ADS on June 13, 2012, approximately *four years and eight months* after Dexter Cummings stated that he would send a cease and desist letter regarding use of "americandiabetes.com." Plaintiff's Lanham Act claims, therefore, were filed within the applicable six-year limitations period. However, Defendants are entitled to a presumption of both inexcusable delay and prejudice on Plaintiff's common law unfair competition claim because Plaintiff filed its lawsuit after the applicable two-year statute of limitations, and Plaintiff has not offered any evidence to rebut a presumption of laches.

---

[26] In paragraphs 15, 16, and 19 of Cummings' subsequent Declaration, which Plaintiff attached as an exhibit to its response in opposition to Friskney and FFT's motion for summary judgment, Cummings clarified that he had an "error in memory" during his deposition with respect to when he learned of ADS's existence. (Cummings Decl. ¶¶ 15–16, 19.) He stated that he had confused "American Diabetes Services" with "American Diabetes Wholesale," the latter having had some type of sponsorship relationship with one of Plaintiff's branch offices, and also having been sued by Plaintiff for infringement. (Id. at ¶ 16.) In their reply brief, Defendants attach the articles of incorporation for "American Diabetes Wholesale, LLC," which reflect that it was incorporated on March 14, 2006. (Defs.' Ex. G, Doc. No. 75.) Cummings' declaration, however, did not pin point the date on which Plaintiff worked with American Diabetes Wholesale, or his awareness of its existence. Nor have Defendants proffered any objective evidence that American Diabetes Wholesale did not exist prior to 2006 under some other type of corporate structure. This reference to selected portions of depositions and exchange of exhibits further reflects that there are outstanding factual issues which preclude summary judgment regarding Plaintiff's knowledge of ADS.

Therefore, I will grant Friskney and FFT's motion as it relates to Plaintiff's common law unfair competition claim.[27]

### C.  Medvantage's Motion for Summary Judgment[28]

Medvantage argues that Plaintiff has failed to establish a *prima facie* case of trademark infringement, unfair competition, false designation, and cyberpiracy against it. Specifically, Medvantage argues summary judgment is appropriate because all of those claims require "actionable use" of the mark as an element of the claims, and Medvantage merely acted as a merchant services provider through which customers browsing "americandiabetesupplies.com" could place orders for products. (Medvantage Mot. Summ. J. 3.) Hence, Medvantage urges that it should be dismissed from this lawsuit because it was not involved in any of the allegedly infringing conduct, and Plaintiff has merely alleged that Medvantage is an "affiliate" of Friskney and FFT, which is insufficient for liability to attach.

Plaintiff responds that "American Diabetes" appeared on the website "americandiabetesupplies.com," and the website indicated that "American Diabetes" was a "division" of Medvantage Plus, LLC. (See Medvantage Ex. B; Pl.'s Resp. 7, Doc. No. 72.) Therefore, Plaintiff contends that Medvantage is contributory or vicariously liable for any infringing acts. More specifically, as discussed *supra*, Friskney admitted that he registered "americandiabetesupplies.com" with GoDaddy on May 5, 2015. Friskney explained that he formed Medvantage to "accept credit card and other payment methods during the 'transition' period pursuant to the Settlement Agreement." (Medvantage Mot. Summ. J. 6.) Friskney is also

---

[27] To the extent Plaintiff alleges common law trademark infringement, I will grant Defendants' motion for summary judgment as well. See Penn. State Univ. v. Univ. Orthopedics, Ltd., 706 A.2d 863, 870 (Pa. Super. 1998) (noting that common law unfair competition encompasses common law trademark infringement).

[28] For this motion, I will view the evidence in the light most favorable to Plaintiff, and resolve all reasonable inferences in its favor.

listed as a managing member and the registered agent of Medvantage in its articles of incorporation with the state of Florida. (Medvantage Ex. C, D.) Finally, Plaintiff cites to Friskney's deposition testimony, wherein he acknowledged that the website "americandiabetsupplies.com" was meant to "all [be] part of the same strategy and plan to migrate customers from the valued and trusted domain American Diabetes to … Medvantage Plus." (Friskney Dep. 76:13–18.)

 "[L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853 (1982). To establish contributory infringement, a plaintiff must prove: (1) supply of a product, and (2) knowledge of direct infringement. Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432 (3d Cir. 1994).

Because Friskney's own testimony reveals that Medvantage was formed to receive migrating customers from "americandiabetes.com" as part of the same overall plan, and because he is a managing member and the registered agent for the organization, I will deny Medvantage's motion for summary judgment with respect to Plaintiff's Lanham Act claims. See id. at 1433 (concluding that "liability based on agency principles is often appropriate" in the context of claims brought under the Lanham Act). Friskney admitted that he was able to sell his products through "americandiabetsupplies.com" even after the registrar lock had been implemented, and "Medvantage Plus, LLC" was displayed on the website underneath an "American Diabetes" logo. Friskney also stated during deposition that "Medvantage [is] where people were going to buy [Friskney's] product[s]." (Friskney Dep. 86:9–10.) As such, Plaintiff has pointed to sufficient record evidence to create a genuine dispute of material fact as to Medvantage's

contributory role in the allegedly infringing conduct at issue, and its role in allegedly committing cyberpiracy.

However, because Medvantage also moved for summary judgment on the grounds of laches, I will grant its motion as to Plaintiff's claim for common law unfair competition for the same reasons outlined in my discussion pertaining to Friskney and FFT's motion.

## IV.   <u>CONCLUSION</u>

Plaintiff's motion for summary judgment on Defendants' counterclaims will be granted. Friskney and FFT's motion for summary judgment on liability will be granted in part and denied in part. The motion will be granted insofar as Friskney and FFT seek judgment on Plaintiff's common law unfair competition claim, but will be denied in all other respects. Because Friskney and FFT materially breached the Settlement Agreement as a matter of law, they will be ordered to show cause within thirty (30) days as to why judgment in favor of Plaintiff on its breach of contract claim is not appropriate pursuant to Federal Rule of Civil Procedure 56(f)(1). Medvantage's motion for summary judgement will be granted in part and denied in part. The motion will be granted insofar as Medvantage seeks judgment on Plaintiff's common law unfair competition claim, but will be denied in all other respects.

An appropriate order follows.